# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DAVID S. BOLIVER,

        Plaintiff,

v.

MBNA AMERICA BANK, N.A.,

        Defendant.

Civil Action No. 05-11346-MEL

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS AND TO COMPEL ARBITRATION, OR, IN THE ALTERNATIVE, TO STAY COURT PROCEEDINGS PENDING COMPLETION OF ARBITRATION

**MBNA AMERICA BANK, N.A.**

Stephen A. Jonas (BBO #542005)
John S. Rhee (BBO #650139)
Christopher B. Zimmerman (BBO #653854)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts  02109
(617) 526-6000

Dated:   September 2, 2005

# TABLE OF CONTENTS

Page

I.   UNDER THE FAA, MBNA IS ENTITLED TO AN ORDER COMPELLING
     BOLIVER TO ARBITRATE HIS CLAIM. ....................................................................3

II.  BOLIVER'S CLAIM IS ARBITRABLE, RENDERING DISMISSAL OF THIS
     ACTION PROPER. ....................................................................................................6

III. IN THE ALTERNATIVE, THIS COURT MUST STAY THESE PROCEEDINGS
     PENDING COMPLETION OF THE ARBITRATION. ..................................................8

US1DOCS 5241262v3

# TABLE OF AUTHORITIES

Page

*Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*,
   96 F.3d 88 (4th Cir. 1996) ...........................................................................................7

*Apollo Computer, Inc. v. Berg*,
   886 F.2d 469 (1st Cir. 1989)..........................................................................................7

*AT&T Tech., Inc. v. Communication Workers of Am.*,
   475 U.S. 643 (1986).......................................................................................................7

*Battels v. Sears Nat'l. Bank*,
   365 F. Supp.2d 1205 (M.D. Ala. 2005) ........................................................................7

*Bercovitch v. Baldwin Sch., Inc.*,
   133 F.3d 141 (1st Cir. 1998)..........................................................................................6

*Clorox Co. v. Proctor & Gamble Commercial Co.*,
   228 F.3d 24 (1st Cir. 2000)............................................................................................1

*In re: Currency Conversion Fee Antitrust Litig.*,
   265 F. Supp.2d 385 (S.D.N.Y. 2003) ...........................................................................7

*Dean Witter Reynolds, Inc. v. Byrd*,
   470 U.S. 213 (1985).......................................................................................................3

*Diamond v. MBNA Am. Bank, N.A.*,
   No. 03-30185, slip op. (D. Mass. Oct. 27, 2003)..................................................3, 4, 6

*Edelist v. MBNA Am. Bank*,
   790 A.2d 1249 (Del. Super. 2001).............................................................................5, 6

*Fluehmann v. Assocs. Fin. Servs.*
   No. CIV. A. 01-40076-NMG, 2002 WL 500564 (D. Mass. Mar. 29, 2002) ...........4, 5

*Gaynoe v. First Union Direct Bank, N.A.*,
   No. 97CVS16536, 2001 WL 34000142 (N.C. Super. Jan. 18, 2001)...........................5

*Grasso v. First USA Bank*,
   713 A.2d 304 (Del. 1998) ..............................................................................................5

*Green Tree Fin. Corp. - Ala. v. Randolph*,
   531 U.S. 79 (2000).........................................................................................................4

*Hoefs v. CACV of Colo., LLC*,
   365 F. Supp.2d 69 (D. Mass. 2005) .....................................................................4, 6, 7, 8

- ii -

*Hurlbut v. Gantshar,*
 674 F. Supp. 385 (D. Mass. 1987) ...........................................................................6, 8

*Keifer Specialty Flooring Inc., v. Tarkett, Inc.,*
 174 F. 3d 907 (7th Cir. 1999) ......................................................................................7

*Large v. Conseco Fin. Servicing Corp.,*
 292 F.3d 49 (1st Cir. 2002)...........................................................................................4

*Lloyd v. MBNA Am. Bank, N.A.,*
 No. Civ. A. 00-109-SLR, 2001 WL 19430 (D. Del. Feb. 22, 2001) ...................................5, 6, 8

*Mattox v. Decision One Mortgage Co.,*
 No. CIV. A. 01-10657-GAO, 2002 WL 31121087 (D. Mass. Sept. 26, 2002)..........................4

*Meades v. Wilmington Hous. Auth.,*
 No. C.A. 19743-NC, 2003 WL 939863 (Del. Ch. Mar. 6, 2003) (unpublished opinion) ...........3

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
 460 U.S. 1 (1983)........................................................................................................4, 6

*Newspaper Guild of Salem v. Ottaway Newspapers, Inc.,*
 79 F.3d 1273 (1st Cir. 1996)..........................................................................................3

*Orman v. Cullman,*
 794 A.2d 5 (Del. Ch. 2002) ...........................................................................................1

*Pick v. Discover Fin. Servs., Inc.,*
 No. Civ. A. 00-935-SLR, 2001 WL 1180278 (D. Del. Sept. 28, 2001) ..................................6

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.,*
 388 U.S. 395 (1967)......................................................................................................7

*Shearson/Am. Express, Inc., v. McMahon,*
 482 U.S. 220 (1987)......................................................................................................8

*Southland Corp. v. Keating,*
 465 U.S. 1 (1984)..........................................................................................................3

*Thompson v. Irwin Home Equity Corp.,*
 300 F.3d 88 (1st Cir. 2002)............................................................................................4

*Uniguard Sec. Ins. Co. v. Banco De Seguros Del Estado,*
 No. Civ. A. 97-12530-PBS, 1998 WL 184368 (D. Mass. Apr. 3, 1998)..................................8

*Volt Info. Scis., Inc. v. Bd. of Trs.,*
 489 U.S. 468 (1989)......................................................................................................6

US1DOCS 5241262v3

*Williams v. Healthalliance Hosp., Inc.*,
   158 F. Supp.2d 156 (D. Mass. 2001) ....................................................................3, 4

*Winterwood Farm, LLC v. JER, Inc.*,
   327 F. Supp.2d 34 (D. Me. 2004) .............................................................................7

## <u>STATUTES</u>

9 U.S.C. § 2 .................................................................................................................3

9 U.S.C. § 3 .................................................................................................................8

9 U.S.C. §§ 1-16 .....................................................................................................2, 3

US1DOCS 5241262v3

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ROBERT C. BOLIVER,

                    Plaintiff,

        v.                                          Civil Action No. 05-11346-MEL

MBNA AMERICA BANK, N.A.,

                    Defendant.

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS AND TO COMPEL ARBITRATION, OR, IN THE ALTERNATIVE, TO STAY COURT PROCEEDINGS PENDING COMPLETION OF ARBITRATION

This is a consumer claim by plaintiff David S. Boliver ("Boliver") against his credit card issuer, defendant MBNA America Bank, N.A. ("MBNA"). Boliver's credit card agreement with MBNA contains an arbitration provision. By this motion, MBNA seeks an order that: (1) compels Boliver to proceed with arbitration, pursuant to the terms of the agreement between MBNA and Boliver; and (2) dismisses Boliver's Complaint; or (3) in the alternative, stays these proceedings until conclusion of the arbitration.

## BACKGROUND AND PROCEDURAL HISTORY

Boliver is delinquent on a credit card account issued by MBNA.[1] The account is governed by a written agreement, as is customary.[2]

---

[1]        As of July 16, 2005, the outstanding balance on Boliver's account was $21,286.11.

[2]        The document attached at Exhibit A is the MBNA credit card account agreement that Boliver entered into in March 2003. Boliver's Complaint specifically alleges "[o]n or about March 2003, the plaintiff entered into an open-ended credit transaction, namely the opening of a MBNA charge account, number 4313035434945051, with Defendant." Compl. at ¶ 1. The Agreement governs all issues concerning Boliver's credit card account with MBNA. Therefore, it is appropriate for this Court to consider the entire Agreement in deciding MBNA's motion to dismiss. See Clorox Co. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000) ("[I]t is well established that in reviewing the complaint, 'we may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment'"); Orman v. Cullman, 794 A.2d 5, 15-16 (Del. Ch. 2002) (accord).

1

The credit card agreement contains an arbitration provision (the "Arbitration Clause") of a type that is common in the credit card industry. The section entitled "Arbitration and Litigation" in the agreement states in relevant part:

> Any claim or dispute ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or any prior Agreement or your account (whether under a statute, in contract, tort or otherwise and whether for money damages, penalties or declaratory or equitable relief), including Claims regarding the applicability of this Arbitration and Litigation Section or the validity of the entire Agreement or any prior Agreement, shall be resolved by binding arbitration. . . . This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA").
>
> * * *
>
> THE RESULT OF THIS ARBITRATION AGREEMENT IS THAT, EXCEPT AS PROVIDED ABOVE, CLAIMS CANNOT BE LITIGATED IN COURT . . . .

Ex. A at 23-25.

Boliver filed his Complaint herein on June 27, 2005. The Complaint alleges that MBNA violated the Fair Credit Billing Act ("FCBA") by failing to take appropriate measures with respect to Boliver's purported "billing error notice." Compl. at ¶¶ 10-14. Boliver seeks statutory damages, injunctive relief, and attorneys' fees and costs. There has been no substantive activity to date in the case: MBNA has not answered the plaintiff's Complaint.[3]

As outlined more fully below, because Boliver's purported claim arises from and relates to his MBNA credit card account, it must be arbitrated in accordance with the Arbitration Clause in the written agreement between MBNA and Boliver. Furthermore,

---

[3] On July 27, 2005 the Court granted MBNA an extension of time until September 2, 2005 to respond to the Complaint in this matter.

US1DOCS 5241262v3

because Boliver's sole claim is arbitrable, the appropriate course is to dismiss the action in its entirety.

## ARGUMENT

### I.    UNDER THE FAA, MBNA IS ENTITLED TO AN ORDER COMPELLING BOLIVER TO ARBITRATE HIS CLAIM.

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  The FAA establishes a "strong national policy favoring arbitration."[4]  Southland Corp. v. Keating, 465 U.S. 1, 10 (1984); Williams v. Healthalliance Hosps., Inc., 158 F. Supp. 2d 156, 159 (D. Mass. 2001) (strong federal policy favoring arbitration; motion to compel arbitration allowed); Meades v. Wilmington Hous. Auth., No. C.A. 19743-NC, 2003 WL 939863, at *4 (Del. Ch. Mar. 6, 2003) (unpublished opinion) ("Delaware has long had a policy favoring arbitration").[5]

Under the FAA, arbitration agreements are to be rigorously enforced.  See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (FAA leaves no place for exercise of discretion by district court).  Indeed, the FAA compels judicial enforcement of an arbitration agreement.  See Newspaper Guild of Salem v. Ottaway Newspapers, Inc., 79 F.3d 1273, 1279 (1st Cir. 1996) (parties must proceed with arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an

---

[4]    The FAA is controlling here.  In Southland Corp. v. Keating, 465 U.S. 1 (1984), the United States Supreme Court held that the FAA is substantive federal law and preempts state laws that seek to interfere with arbitration.  See Southland Corp., 465 U.S. at 16.  Moreover, the Arbitration Clause specifically states that "[t]his arbitration provision . . . shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA")."  Ex. A at 23-25.

[5]    The written agreement is governed by Delaware law, as specified by the agreement's choice of law provision.  Ex. A at 22.  As is discussed further infra, the Arbitration Clause in Boliver's MBNA credit card agreement is enforceable both under the Massachusetts and Delaware law.  See, e.g., Diamond v. MBNA Am. Bank, N.A., No. 03-30185, slip op. (D. Mass. Oct. 27, 2003), attached hereto as Exhibit B.

interpretation that covers the asserted dispute") (quotations and citations omitted). Any doubt regarding the scope of arbitrable issues must be "resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation or waiver, delay, or a like defense to arbitrability." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25 (1983); Williams, 158 F. Supp.2d at 159 ("[A]ny doubt over whether a particular dispute is covered by an arbitration agreement should be resolved in favor of arbitration.").

Reflecting this clear trend in favor of the enforceability of arbitration clauses, the United States Supreme Court and other courts, including the First Circuit and the District of Massachusetts, have routinely enforced arbitration provisions contained in standard form contracts in consumer credit agreements.[6]

Moreover, this Court and other courts have held arbitration provisions in MBNA credit card agreements -- virtually identical to that contained in Boliver's agreement -- to be enforceable in cases involving other MBNA credit card holders. See Hoefs v. CACV of Colo., LLC, 365 F. Supp.2d 69, 76 (D. Mass. 2005) (Neiman, J.) (finding MBNA arbitration provision to be enforceable and applicable to MBNA's assignee and granting motion to dismiss); Diamond v. MBNA Am. Bank, N.A., No. 03-30185, slip op. (D. Mass. Oct. 27, 2003) (Ponsor, J.) (holding arbitration clause in MBNA credit card

---

[6]    See, e.g., Green Tree Fin. Corp. - Ala. v. Randolph, 531 U.S. 79, 89-90 (2000); Large v. Conseco Fin. Servicing Corp., 292 F.3d 49, 52 (1st Cir. 2002) (affirming district court's grant of motion to compel arbitration in mortgage context); Thompson v. Irwin Home Equity Corp., 300 F.3d 88, 92 (1st Cir. 2002) (affirming district court's granting motion to compel arbitration in mortgage context); Mattox v. Decision One Mortgage Co., No. CIV. A. 01-10657-GAO, 2002 WL 31121087, at *1 (D. Mass. Sept. 26, 2002) (granting motion to compel arbitration in mortgage context); Fluehmann v. Assocs. Fin. Servs., No. CIV. A. 01-40076-NMG, 2002 WL 500564, at *10 (D. Mass. Mar. 29, 2002) (granting motion to stay in favor of arbitration in mortgage context).

agreement fully enforceable and allowing MBNA's motion to dismiss);[7] Edelist v. MBNA Am. Bank, 790 A.2d 1249, 1253-4 (Del. Super. 2001) (finding MBNA arbitration provision enforceable in its entirety and granting MBNA's motion to dismiss); Lloyd v. MBNA Am. Bank, N.A., No. Civ. A. 00-109-SLR, 2001 WL 194300, at *3-4 (D. Del. Feb. 22, 2001), aff'd 2002 WL 21932 (3d Cir. Jan. 7, 2002) (granting motion to dismiss in favor of binding arbitration where MBNA credit card contained arbitration clause).

Boliver has in no way questioned the validity of his credit card agreement with MBNA, or any of the terms or provisions therein. See Compl. at ¶¶ 5-14. Rather, Boliver accepted the terms of the agreement by making numerous purchases with his MBNA credit card from 2003, when he first opened his account, until 2005,[8] when he allegedly submitted a "notice of billing error." See id. at ¶¶ 5-8; Grasso v. First USA Bank, 713 A.2d 304, 308-09 (Del. 1998) (credit card holder accepted agreement's terms by using credit card); Gaynoe v. First Union Direct Bank, N.A., No. 97CVS16536, 2001 WL 34000142, at *6 (N.C. Super. Jan. 18, 2001) (cardholder's use of credit card issued by bank constituted acceptance of the contract terms); see also Fluehmann v. Assocs. Fin. Servs., No. CIV. A. 01-40076-NMG, 2002 WL 500564, at *7 (D. Mass. Mar. 29, 2002) (acceptance of initial agreement and separate agreement to arbitrate found where party received benefits under agreements).

In light of the irrefutable terms of the Arbitration Clause, Boliver's acceptance of the terms of his credit card agreement, and the overwhelming case law favoring

---

[7]    Judge Ponsor issued his findings on the record, following a hearing. A true and accurate copy of relevant portions of the Diamond transcript is attached hereto as Exhibit B.

[8]    Boliver's credit card agreement with MBNA expressly provides that "[t]he terms of this Agreement apply to you if any of you applied for and were granted an account, *used the account*, maintained the account, and/or otherwise accepted the account." Ex. A at 2 (emphasis added).

enforcement of arbitration agreements, this Court should compel Boliver to arbitrate his claim.

## II.  BOLIVER'S CLAIM IS ARBITRABLE, RENDERING DISMISSAL OF THIS ACTION PROPER.

"[A] court may dismiss, rather than stay, a case when all of the issues before the court are arbitrable." Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 156 n.21 (1st Cir. 1998) (dismissal of entire action proper where all claims arbitrable); Hoefs 365 F. Supp.2d at 76 (dismissing action where all claims arbitrable under MBNA credit card agreement's arbitration provision); Diamond, No. 03-30185, slip op. (D. Mass. Oct. 27, 2003) (accord); Hurlbut v. Gantshar, 674 F. Supp. 385, 392 (D. Mass. 1987) (dismissing action where all claims arbitrable); Lloyd, 2001 WL 194300, at * 4 (dismissal is permitted, as an alternative to staying proceedings, if all claims are arbitrable; complaint dismissed); Pick v. Discover Fin. Servs., Inc., No. Civ. A. 00-935-SLR, 2001 WL 1180278, at *5 (D. Del. Sept. 28, 2001) (complaint dismissed where claims arbitrable under credit card agreement arbitration clause); Edelist, 790 A.2d at 1261 (dismissing complaint).  The language of the parties' arbitration clause itself determines what issues the parties agreed to arbitrate.  See Volt Info. Scis., Inc. v. Bd. of Trs., 489 U.S. 468, 478 (1989) (FAA "requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms"); Moses, 460 U.S. at 24-5.  Here, the Arbitration Clause is broad, applying to "[a]ny claim or dispute . . . relating in any way to this Agreement or any prior Agreement or your account . . . including Claims regarding the applicability of this Arbitration Section or the validity of the entire Agreement . . ."[9]

---

[9]     The general rule is that questions of arbitrability are to be determined by the court.  However, here, this Court need not even reach the issue of arbitrability because the agreed to Arbitration Clause encompasses: "Claims regarding the applicability of this Arbitration Section," demonstrating that the

Ex. A at 23; Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 398 (1967)

(analogous language demonstrated "broad" arbitration clause); Winterwood Farm, LLC

v. JER, Inc., 327 F. Supp.2d 34, 39 (D. Me. 2004) (accord).[10]

Because Boliver's single FCBA claim directly relates to his credit card account

and falls squarely within the Arbitration Clause of his written credit card agreement,

dismissal of this action is, therefore, appropriate.  See AT&T Tech., Inc. v.

Communication Workers of Am., 475 U.S. 643, 650 (1986) (FAA creates the

presumption that a contractual arbitration clause must be enforced unless "it can be said

with positive assurance that the arbitration clause is not susceptible of an interpretation

that covers the asserted dispute").  Indeed, numerous courts have found that claims

brought under the FCBA, and similar consumer protection statutes, are subject to

arbitration pursuant to the FAA.  See, e.g., Battels v. Sears Nat'l Bank, 365 F. Supp.2d

1205, 1217 (M.D. Ala. 2005) (compelling arbitration of FCBA claims under credit card

agreement); Hoefs, 365 F. Supp.2d at 71 (compelling arbitration of claims brought under

Fair Debt Collection Practices Act pursuant to MBNA credit card agreement); In re

Currency Conversion Fee Antitrust Litig., 265 F. Supp.2d 385, 408, 416 (S.D.N.Y. 2003)

---

parties intended that issues of arbitrability were also to be determined by the arbitrator.  Ex. A at 23; see Apollo Computer, Inc. v. Berg, 886 F.2d 469, 472-73 (1st Cir. 1989) (parties contracted to submit issues of arbitrability to the arbitrator; parties may agree to let arbitrator decide whether issues are arbitrable, including whether a valid arbitration agreement exists).  Moreover, to the extent that this Court has doubts concerning the scope of the arbitrable issues in the instant action, the heavy presumption of arbitrability requires that when the scope of an arbitration clause is open to question, a court must decide the question in favor of arbitration.  Williams, 158 F. Supp.2d at 159 ("[A]ny doubt over whether a particular dispute is covered by an arbitration agreement should be resolved in favor of arbitration").

[10]    See also Keifer Specialty Flooring Inc. v. Tarkett, Inc., 174 F.3d 907, 909 (7th Cir. 1999) (arbitration provisions that apply to all claims "arising out of or relating to" the underlying agreement are "extremely broad and capable of an expansive reach"); Am. Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88, 93 (4th Cir. 1996) (The "sweeping language" of such a broad arbitration provision "*d[oes] not limit arbitration to the literal interpretation or performance of the contract*, but embrace[s] every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute.") (emphasis in original) (internal brackets and quotation marks and citation omitted).

(enforcing credit card agreement arbitration clauses and compelling arbitration of claims brought pursuant to Truth In Lending Act).

Boliver's claim is arbitrable because it relates to Boliver's account with MBNA. Thus, this Court should grant MBNA's Motion and dismiss Boliver's Complaint in its entirety.  See Ex. A at 23 (Arbitration Clause governs "[a]ny claim . . . whether under a statute, in contract, tort, or otherwise . . ."); Hoefs, 365 F. Supp.2d at 71 (compelling arbitration and dismissing federal statutory and state law consumer protection claims); Lloyd, 2001 WL 194300, at *1 (MBNA arbitration clause covered federal statutory claim, consumer fraud claim and claims in contract).[11]

## III.    IN THE ALTERNATIVE, THIS COURT MUST STAY THESE PROCEEDINGS PENDING COMPLETION OF THE ARBITRATION.

Section 3 of the FAA requires that any other proceedings be stayed while a dispute subject to arbitration is resolved through arbitration.

> If any suit of proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing . . . the court . . . shall . . . stay the trial of the action until such arbitration has been had . . .

9 U.S.C. § 3; Shearson/Am. Express, Inc., 482 U.S. at 226 (a court must stay its proceedings if an issue is arbitrable under the agreement).  Thus, even if this Court declines to dismiss the action, it must, at a minimum, stay these proceedings pending completion of the arbitration.

---

[11]    See also Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 226 (1987) (statutory claims subject to arbitration); Uniguard Sec. Ins. Co. v. Banco De Seguros Del Estado No. Civ. A. 97-12530-PBS, 1998 WL 184368, *1 (D. Mass. Apr. 3, 1998) (broad arbitration clause covered contract, tort or statutory claims); Hurlbut, 674 F. Supp. at 392 (accord).

## CONCLUSION

Based on the foregoing discussion, MBNA respectfully requests the entry of an order compelling arbitration and dismissing Boliver's claims in entirety.  In the alternative, MBNA requests this Court to stay all proceedings pending conclusion of the arbitration.

MBNA AMERICA BANK, N.A.

By its attorneys,


_/s/ Christopher B. Zimmerman___
Stephen A. Jonas (BBO #542005)
John S. Rhee (BBO #650139)
Christopher B. Zimmerman (BBO #653854)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts  02109
(617) 526-6000


Dated:   September 2, 2005

- 9 -

<u>CERTIFICATE OF SERVICE</u>

I, Christopher B. Zimmerman, hereby certify that I have on this 2d day of

September, 2005, served a true and accurate copy of the foregoing document by certified

mail on Njoroge Kamau, P.O. Box 60251, Worcester, MA  01606.


_/s/ Christopher B. Zimmerman__
Christopher B. Zimmerman

US1DOCS 5241262v3

# Exhibit A

## PREFERRED CARD

## DAVID S BOLIVER

**CREDIT CARD AGREEMENT**

**CONTENTS (Selected Sections)**

- YOUR CONTRACT WITH US                          2
- PRIVACY NOTICE                                 2
- TIPS TO PROTECT YOUR INFORMATION              6
- WORDS USED OFTEN IN THIS AGREEMENT            8
- ANNUAL PERCENTAGE RATES                       11
- ACCOUNT FEES                                  13
- HOW TO USE YOUR ACCOUNT                       14
- PAYMENTS ON YOUR ACCOUNT                      15
- WE MAY AMEND THIS AGREEMENT                   19
- UNAUTHORIZED USE OF YOUR CARD                 22
- ARBITRATION AND LITIGATION                    23
- YOUR BILLING RIGHTS                           25

**CREDIT CARD AGREEMENT**

**YOUR CONTRACT WITH US**

Your Agreement with us consists of this Credit Card Agreement and any changes we make to it from time to time. The terms of this Agreement apply to you if any of you applied for and were granted an account, used the account, maintained the account, and/or otherwise accepted the account. You agree to the terms and conditions of this Agreement.

**PRIVACY NOTICE**

**Important Information About Your Financial Privacy**

MBNA is the world's largest independent credit card issuer. Our financial products and services are endorsed by thousands of organizations and financial institutions. We back our financial products and services with top quality service. Collecting and sharing information about you helps us do this. This notice explains MBNA's information collection and sharing practices and lets you choose whether MBNA may share certain information about you.

This notice describes the privacy practices of MBNA Corporation and all its affiliates, including:
- MBNA America Bank, N.A.
- MBNA America (Delaware), N.A.
- MBNA Technology, Inc.
- MBNA Marketing Systems, Inc.
- MBNA Insurance Agency, Inc.

(We'll refer to these collectively as "MBNA"), for financial products and services governed by the laws of the United States of America.

2

**Our Security Procedures Protect Your Information**

We work hard to keep information secure. For example, our information security policies:

- Govern retention of sensitive information;
- Restrict access to information systems; and
- Specify password requirements.

Our practices and procedures meet federal standards. Further, we share only the information we believe is needed to offer a product or service efficiently. Finally, we restrict the use of such information and require that it be kept secure.

**Information We Collect to Conduct Our Business**

We collect information about you to conduct our business and deliver the top quality service you expect. Sources include:

- Information we receive from you.
- Information we receive from third parties, such as consumer reporting agencies, to verify statements you've made to us, or regarding your employment, credit, or other relationships;
- Information about your transactions with MBNA and with other companies.

**Information Shared Within MBNA**

We may share all the information we collect within MBNA. For example, we may share:

- Identification information (such as name and address);
- Transaction and experience information (such as purchases and payments);
- Credit eligibility information (such as credit reports); and
- Other information.

You may tell us not to share credit eligibility information about you within MBNA, as explained below in the section

3

captioned, "<u>Information Sharing: It's Your Choice</u>." Your choice will not affect the sharing of identification and transaction and experience information.

**Information Shared Outside of MBNA**

We may share all the information we collect with the following types of companies outside of MBNA:

- Financial service companies (like banks, insurance companies, securities broker-dealers, and organizations with which we have joint marketing agreements);
- Non-financial companies (like retailers, direct marketers, communications companies, travel companies, and organizations endorsing MBNA);
- Companies performing marketing or other services for us (like data processing or direct mail services); and
- Other companies (like nonprofit organizations).

We may also share all of the information we collect with companies outside of MBNA as permitted by law.

You may tell us not to share information about you with companies outside of MBNA, as explained below in the section captioned, "<u>Information Sharing: It's Your Choice</u>." Your choice will not affect sharing with:

- Companies performing marketing or other services for us;
- Other financial institutions under joint marketing agreements;
- Government entities in response to subpoenas or regulatory requirements;
- Consumer reporting agencies; and
- As otherwise permitted by law.

4

**Information Sharing: It's Your Choice**

We respect your choices related to privacy. You may tell us not to share credit eligibility information within MBNA and not to share information with companies outside of MBNA as described above. **If you wish to opt out of such information sharing, please call our toll-free automated response line at 1-866-751-1255.** We will ask you to verify your identity and the specific accounts to which your opt out applies. Please have your account, membership, or reference numbers available when you call. For deposit accounts, please have your Social Security number or Taxpayer Identification number available when you call.

MBNA applies opt outs at the account level, not by individual Customer. When any person listed on an account opts out, we opt out the entire account. This includes co-applicants, joint account holders, and authorized users. MBNA follows these privacy practices if an account is closed or becomes inactive.

Your opt out remains effective until revoked in writing. Federal law requires us to provide this notice on an annual basis, whether or not you previously opted out. **Please remember that if you previously opted out an account you do not need to opt out that account again.**

**IMPORTANT INFORMATION FOR VERMONT CUSTOMERS**

The information sharing practices described above are in accordance with Federal law. Vermont law places

5

additional limits on sharing information about Vermont residents so long as they remain residents of Vermont. In accordance with Vermont law, MBNA will not share information we collect about Vermont residents to companies outside of MBNA except:

- As permitted by law;
- To companies that perform marketing or other services on our behalf;
- Name, contact and transaction and experience information (such as your account balance and payment history) to other financial institutions with which we have joint marketing agreements; or
- With the authorization or consent of the Vermont resident.

MBNA will not share credit eligibility information about Vermont residents within MBNA except with the authorization or consent of the Vermont resident.

**Updates and Additional Information**

This notice replaces any previous notices from MBNA about the privacy, security, and protection of information. For additional information regarding our Internet privacy practices, and to view the current version of this privacy notice, go to http://www.mbna.com/privacy.html. You may have other privacy protections under state laws. We may amend this privacy notice at any time. We will inform you of changes as required by law.

**TIPS TO PROTECT YOUR INFORMATION**

*MBNA works hard to keep your information secure. You can help by following these tips to protect your information:*

6

*Store personal information in a safe place and tear up or shred old receipts and account statements before throwing them away.*

*Protect your PINs and other passwords. Do not share them with anyone unless it's for a service or transaction you request and you are confident the other party will protect the information as you would.*

*Carry only the minimum amount of identifying information you require.*

*Pay attention to billing cycles and statements. Inquire if you do not receive a bill.*

*Check account statements carefully to ensure all charges, checks, or withdrawals are authorized.*

*Guard your mail from theft. Do not leave bill payment envelopes in your mailbox with the flag up. Instead, deposit them in a post office collection box or at the local post office. Promptly remove incoming mail.*

*Order copies of your credit report from each of the three major credit bureaus once a year to ensure they are accurate. The law permits the credit bureaus to charge up to $8.00 for a copy of the report (unless you live in a state that requires the credit bureaus to provide you with one free copy of your report annually).*

*If you believe you are a victim of identity theft take immediate action and keep records of your conversations and correspondence. While the steps you must take will vary with your individual circumstances, three basic actions are appropriate in almost every case:*

- *Contact the creditors for any accounts that have been tampered with or opened fraudulently.*

- *Contact the fraud departments of each of the three major credit bureaus:*

7

*Equifax: 1-800-525-6285 / P.O. Box 740241, Atlanta, GA 30374-0241*

*Experian: 1-888-397-3742 / P.O. Box 9532, Allen, Texas 75013*

*Trans Union: 1-800-680-7289 / P.O. Box 6790, Fullerton, CA 92834*

- *File a report with your local police or the police in the community where the identity theft took place and get a copy of the police report.*

*Although many consumers appreciate the convenience and customer service of direct marketing:*

- *If you prefer not to receive pre-approved offers of credit, you can opt out of such offers by calling 1-888-5-OPT OUT.*

- *If you want to remove your name from many national direct mail lists, send your name and address to:*

*DMA Mail Preference Service*
*P.O. Box 643*
*Carmel, NY 10512*

- *If you want to reduce the number of telephone solicitations from many national marketers, send your name, address and telephone number to:*

*DMA Telephone Preference Service*
*P.O. Box 1559*
*Carmel, NY 10512*

*From "ID Theft; When Bad Things Happen to Your Good Name", Federal Trade Commission, February 2002*

## WORDS USED OFTEN IN THIS AGREEMENT

"Access check" means an access check we provide to you to make a Check Cash Advance on your account.

8

"Agreement" or "Credit Card Agreement" means this document and any changes we make to this document from time to time.

"Card" means all the credit cards we issue to you and to any other person with authorization for use on this account pursuant to this Agreement.

"Cash Advance" means the use of your account for a loan obtained:
1. at an automated teller machine ("ATM Cash Advance");
2. by a transfer of funds initiated by us at your request ("Balance Transfer");
3. at any financial institution (e.g., obtaining cash, money order, or travelers checks) or for any payment you make to us that is returned to us unpaid for any reason, including the related finance charges ("Bank Cash Advance");
4. by an access check you sign as drawer ("Check Cash Advance");
5. by any other method ("Other Cash Advance").

"Cash Advance" includes Transaction Fees and adjustments associated with any Cash Advance.

"Grace Period" means the period of time when you will not accrue Periodic Rate Finance Charges on certain transactions or balances.

"New Balance Total" means the total billed amount as of the Closing Date of a billing cycle. As shown on your monthly statement, we start with the total balance at the beginning of the billing cycle, which is the "Previous Balance." Then we subtract payments and credits. Then we add Cash Advances, Purchases and finance charges.

"Purchase" means the use of your card or account number to:
1. buy or lease goods or services;
2. buy "Cash Equivalents" (i.e., wire transfers, person to person money transfers, bets, lottery tickets, or casino

9

gaming chips) from any seller other than a
financial institution;
3. make a transaction that is not otherwise a
Cash Advance.

"Purchase" includes Account Fees, as well as
Transaction Fees and adjustments associated
with any Purchase.

"We," "us," "our," "MBNA" and "MBNA
America" mean MBNA America Bank, N.A.

"You" and "your" mean each and all of the
persons who are granted, accept or use an
account we hold. "You" and "your" also mean any
other person who has guaranteed payment of
this account, when used in the sections
captioned, YOUR CONTRACT WITH US, WE
MAY MONITOR AND RECORD TELEPHONE
CALLS, and ARBITRATION AND LITIGATION,
and when used in each of the sections relating to
payment of this account (e.g., YOUR PROMISE
TO PAY, and HOW WE ALLOCATE YOUR
PAYMENTS).

For the purpose of the Privacy Notice, we will
use the definition(s) contained in the Privacy
Notice. For the remainder of the Agreement, we
will use the definitions described under the
section heading WORDS USED OFTEN IN THIS
AGREEMENT or as otherwise defined in this
Agreement. If we use a capitalized term in this
document but we do not define the term in this
document, the term has the meaning as used in
your monthly statement.

We use section headings (e.g., WORDS
USED OFTEN IN THIS AGREEMENT) to
organize this Agreement. The headings are for
reference purposes only.

## CATEGORIES OF BALANCES

When a Cash Advance or Purchase
transaction occurs, we add the amount of the
transaction and any associated finance charges,
to one of the following balance categories:
Category A –  Balance Transfers and Check
             Cash Advances

Category B –  ATM Cash Advances, Bank Cash
Advances and Other Cash
Advances

Category C –  Purchases

Category D –  Other Balances

From time to time, we may move certain
balances from one category to another (for
example, so we can accommodate promotional
terms), and we will tell you when we do.

## ANNUAL PERCENTAGE RATES

"APR" means Annual Percentage Rate.
"DPR" means Daily Periodic Rate and is
calculated by dividing the APR by 365.
"Promotional Rate" means a temporary DPR
(and corresponding APR) that may be offered on
a category for a designated time period, and may
be subject to other conditions.
Each balance category has its own APR.

## Category A Balance Transfers and Check Cash Advances:

The current DPR for Category A balances is a
promotional DPR of 0.007945% (corresponding
**ANNUAL PERCENTAGE RATE of 2.90%**) in
effect through your statement Closing Date in
September 2003. However, if any minimum
payment is not received by its Payment Due
Date, the promotional period will end as of the
day before the first day of the billing cycle in
which such payment is missed. After the
promotional period ends, the DPR for all new and
outstanding Category A balances will be
0.030109% (corresponding **ANNUAL
PERCENTAGE RATE of 10.99%**).

## Category B Bank and ATM Cash Advances:

The current DPR for Category B balances is
0.030109% (corresponding **ANNUAL
PERCENTAGE RATE of 10.99%**).

## Category C Purchases:

The current DPR for Category C balances is
0.030109% (corresponding **ANNUAL
PERCENTAGE RATE of 10.99%**).

11

**Category D Other Balances:**
The current DPR for Category D balances is 0.030109% (corresponding **ANNUAL PERCENTAGE RATE** of **10.99%**).

## CALCULATION OF PERIODIC RATE FINANCE CHARGES

We calculate Periodic Rate Finance Charges for each category by multiplying its Balance Subject to Finance Charge by the applicable DPR and that result by the number of days in the billing cycle.

## BILLING CYCLE

Your billing cycle ends each month on a Closing Date determined by us. Each billing cycle begins on the day after the Closing Date of the previous billing cycle. Each statement reflects a single billing cycle.

## TRANSACTION FEE FINANCE CHARGES

If you obtain an ATM Cash Advance, we will assess a transaction fee **(FINANCE CHARGE)** equal to 3.00% of the U.S. dollar amount of each such Cash Advance (Fee: Min. $5.00).

If you obtain a Balance Transfer, we will assess a transaction fee **(FINANCE CHARGE)** equal to 3.00% of the U.S. dollar amount of each such Cash Advance (Fee: Min. $5.00; Max. $50.00).

If you obtain a Bank Cash Advance, we will assess a transaction fee **(FINANCE CHARGE)** equal to 3.00% of the U.S. dollar amount of each such Cash Advance (Fee: Min. $5.00). This fee is not assessed for a Bank Cash Advance resulting from any payment you make to us that is returned to us unpaid for any reason.

If you use your card to purchase Cash Equivalents, or if you obtain Other Cash Advances, we will assess a transaction fee **(FINANCE CHARGE)** equal to 3.00% of the U.S. dollar amount of each such Cash Equivalent or Other Cash Advance (Fee: Min. $5.00).

If you obtain a Check Cash Advance, we will assess a transaction fee **(FINANCE CHARGE)** equal to 3.00% of the U.S. dollar amount of each such Cash Advance (Fee: Min. $5.00; Max. $50.00).

### ACCOUNT FEES

The following fees are assessed as Purchases in the billing cycle in which the fees accrue:

There is no Annual Fee.

An Overlimit Fee of $29.00 if your total outstanding balance exceeds your credit limit on the Closing Date of a billing cycle, even if fees or finance charges assessed by us cause your total outstanding balance to exceed your credit limit; an Overlimit Fee is assessed to your account as of the day in the billing cycle that your total outstanding balance exceeds your credit limit.

A Late Fee of $29.00 if the Total Minimum Payment Due shown on your monthly statement is not received by us on or before its Payment Due Date.

A Returned Payment Fee of $29.00 if a payment on your account is returned for insufficient funds or for any other reason, even if it is paid upon subsequent presentment.

A Returned Check Cash Advance Fee of $29.00 if we return an access check unpaid for any reason, even if the access check is paid upon subsequent presentment.

A Copy Fee of $5.00 for each copy of a monthly statement or sales draft, except that the six most recent monthly statements and one sales drafts will be provided for free.

An Abandoned Property Fee equal to any costs incurred by us for complying with state abandoned property laws, unless prohibited by applicable law.

## SIGN YOUR CARD
You should sign your card before you use it.

## HOW TO USE YOUR ACCOUNT
You may obtain credit in the form of Purchases and Cash Advances by using cards, access checks, your account number, or other credit devices.

## WE MAY MONITOR AND RECORD TELEPHONE CALLS
You consent to and authorize MBNA America, any of its affiliates, or its marketing associates to monitor and/or record any of your telephone conversations with our representatives or the representatives of any of those companies.

## CREDIT REPORTING AGENCIES
You authorize MBNA America to collect information about you, including credit reports from consumer reporting agencies.

If you believe we have furnished inaccurate or incomplete information about you or your account to a credit reporting agency, write to us at: MBNA, Credit Reporting Agencies, P.O. Box 17054, Wilmington, DE 19884-7054. Please include your name, address, home phone number, and account number, and explain what you believe is inaccurate or incomplete.

## PURPOSES FOR USING YOUR ACCOUNT
You may use your account for personal, family, or household purposes. You may not use your account for business or commercial purposes. You may not use a Check Cash Advance, or any other Cash Advance, to make a payment on this or any other credit account with us. You may not use or permit your account to be used to make any illegal transaction.

## PERSONS USING YOUR ACCOUNT
If you permit any person to use your card, access checks, account number, or other credit device with the authorization to obtain credit on your account, you may be liable for all

14

transactions made by that person including transactions for which you may not have intended to be liable, even if the amount of those transactions causes your credit limit to be exceeded. Authorized users of this account may have the same access to information about the account and its users as the account holders.

## YOUR PROMISE TO PAY

You promise to pay us the amounts of all credit you obtain, which includes all Purchases and Cash Advances. You also promise to pay us all the amounts of finance charges, fees, and any other transactions we charge to your account.

## PAYMENTS ON YOUR ACCOUNT

You must pay each month at least the Total Minimum Payment Due shown on your monthly statement by your Payment Due Date. Payments must conform to the requirements set out on that monthly statement; these requirements may vary without prior notice. You may pay the entire amount you owe us at any time. Payments made in any billing cycle that are greater than the Total Minimum Payment Due will not affect your obligation to make the next Total Minimum Payment Due. If you overpay or if there is a credit balance on your account, we will not pay interest on such amounts. We will reject payments that are not drawn in U.S. dollars and those drawn on a financial institution located outside of the United States. We reserve the right to reject any payment if your account has a credit balance as of the day we receive that payment. Payment of your Total Minimum Payment Due may not avoid the assessment of Overlimit Fees. Generally, credits to your account, such as those generated by merchants or by person-to-person money transfers, are not treated as payments and will not reduce your Total Minimum Payment Due.

## TOTAL MINIMUM PAYMENT DUE

You may pay all or part of the total outstanding balance at any time. Each billing cycle, you must pay at least the Total Minimum Payment Due shown on your monthly statement. The Total Minimum Payment Due shown on your

15

monthly statement each billing cycle will be the sum of the Current Payment shown on your monthly statement plus all past due amounts.

The Current Payment each billing cycle will be the lesser of: (1) the sum, rounded down to the nearest dollar, of all Periodic Rate Finance Charges, Transaction Fees, and Account Fees (excluding Returned Check Cash Advance Fees and Copy Fees) plus $15.00; or (2) 2.25% of the New Balance Total, rounded down to the nearest dollar. The Current Payment will never be less than $15.00 unless your New Balance Total is less than $15.00 in which case the Total Minimum Payment Due will equal the New Balance Total. The Total Minimum Payment Due will never be more than your New Balance Total. If a payment is credited to your account but is returned unpaid in a later billing cycle, we will recalculate the Total Minimum Payment Due for the billing cycle in which the payment was originally credited.

## WHEN YOUR PAYMENT WILL BE CREDITED TO YOUR ACCOUNT

We credit payments as of the date received, if the payment is: (1) received by 2 p.m. (Eastern Time); (2) received at the address shown in the upper left-hand corner of the front of your monthly statement; (3) paid with a check drawn in U.S. dollars on a U.S. financial institution or a U.S. dollar money order; and (4) sent in the return envelope with only the top portion of your statement accompanying it. Payments received after 2 p.m. on any day including the Payment Due Date, but that otherwise meet the above requirements, will be credited as of the next day. Credit for any other payments may be delayed up to five days.

## HOW WE ALLOCATE YOUR PAYMENTS

We will allocate your payments in the manner we determine. In most instances, we will allocate your payments to balances (including transactions made after your latest statement) with lower APRs before balances with higher APRs. This will result in balances with lower APRs (such as new balances with promotional

APR offers) being paid before any other existing balances.

## PROMISE TO PAY APPLIES TO ALL PERSONS

All persons who initially or subsequently request, accept, guarantee or use the account are individually and together responsible for any total outstanding balance. If you and one or more persons are responsible to pay any total outstanding balance, we may refuse to release any of you from liability until all of the cards, access checks, and other credit devices outstanding under the account have been returned to us and you repay us the total outstanding balance owed to us at any time under the terms of this Agreement.

## DEFAULT

You will be in default of this Agreement if: (1) you fail to make any required Total Minimum Payment Due by its Payment Due Date; (2) your total outstanding balance exceeds your credit limit; or (3) you fail to abide by any other term of this Agreement. Solely for the purposes of determining eligibility and premium payment obligations for the optional credit insurance purchased through MBNA, you will be deemed in default or delinquent if you fail to make a payment within 90 days of your Payment Due Date. Our failure to exercise any of our rights when you default does not mean that we are unable to exercise those rights upon later default.

## WHEN WE MAY REQUIRE IMMEDIATE PAYMENT

If you are in default we can require immediate payment of your total outstanding balance and, unless prohibited by applicable law and except as otherwise provided under the Arbitration and Litigation section of this Agreement, we can also require you to pay the costs we incur in any collection proceeding, as well as reasonable attorneys' fees if we refer your account for collection to an attorney who is not our salaried employee.

## OTHER PAYMENT TERMS

We can accept late payments, partial payments, or payments with any restrictive writing without losing any of our rights under this Agreement. This means that no payment, including those marked with "Paid in full" or with any other restrictive words, shall operate as an accord and satisfaction without the prior written approval of one of our senior officers. You may not use a postdated check to make a payment. If you do postdate a payment check, we may elect to honor it upon presentment or return it uncredited to the person that presented it, without in either case waiting for the date shown on the check. We are not liable to you for any loss or expense incurred by you arising out of the action we elect to take.

## PAYMENT HOLIDAYS AND REDUCED PAYMENT OFFERS

We may allow you, from time to time, to omit a monthly payment or make a reduced payment. We will notify you when these options are available. If you omit a payment or make a reduced payment, finance charges, applicable fees, and other regular transactions, if any, will accrue on your account balances in accordance with this Agreement. The reduced payment amount may be less than your finance charges. You must make the reduced payment on time to avoid a late fee. You must resume making your regular Total Minimum Payment Due each month following a payment holiday or reduced payment offer.

## YOUR CREDIT LIMIT

Your credit limit is disclosed to you when you receive your card and, generally, on each monthly statement. We may change your credit limit from time to time. The amount shown on your monthly statement as Cash or Credit Available does not take into account any Purchases, Cash Advances, finance charges, fees, any other transactions, or credits which post to your account after the Closing Date of that monthly statement. Such transactions could result in your credit limit being exceeded and result in the assessment of Overlimit Fees.

18

## WHAT WE MAY DO IF YOU ATTEMPT TO EXCEED YOUR CREDIT LIMIT

The total outstanding balance on your account plus authorizations at any time must not be more than your credit limit. If you attempt a transaction which results in your total outstanding balance (plus authorizations) exceeding your credit limit, we may: (1) permit the transaction without raising your credit limit; (2) permit the transaction and treat the amount of the transaction that is more than the credit limit as immediately due; or (3) refuse to permit the transaction.

If we refuse to permit the transaction, we may advise the person who attempted the transaction that it has been refused. If we refuse to permit a Check Cash Advance or Balance Transfer, we may do so by advising the person presenting the Check Cash Advance or Balance Transfer that credit has been refused, that there are insufficient funds to pay the Check Cash Advance or Balance Transfer, or in any other manner.

If we have previously permitted you to exceed your credit limit, it does not mean that we will permit you to exceed your credit limit again. If we decide to permit you to exceed your credit limit, we may charge an Overlimit Fee as provided in this Agreement.

## WE MAY AMEND THIS AGREEMENT

We may amend this Agreement at any time. We may amend it by adding, deleting, or changing provisions of this Agreement. When we amend this Agreement we will comply with the applicable notice requirements of federal and Delaware law that are in effect at that time. If an amendment gives you the opportunity to reject the change, and if you reject the change in the manner provided in such amendment, we may terminate your right to receive credit and may ask you to return all credit devices as a condition of your rejection. The amended Agreement (including any higher rate or other higher charges or fees) will apply to the total outstanding balance, including the balance existing before the

19

amendment became effective. We may replace your card with another card at any time.

## WE MAY SUSPEND OR CLOSE YOUR ACCOUNT

We may suspend or close your account or otherwise terminate your right to use your account. We may do this at any time and for any reason. Your obligations under this Agreement continue even after we have done this. You must destroy all cards, access checks or other credit devices on the account when we request.

## YOU MAY CLOSE YOUR ACCOUNT

You may close your account by notifying us in writing or by telephone, and destroying all cards, access checks or other credit devices on the account. Your obligations under this Agreement continue even after you have done this.

## TRANSACTIONS AFTER YOUR ACCOUNT IS CLOSED

When your account is closed, you must contact anyone authorized to charge transactions to your account, such as internet service providers, health clubs or insurance companies. These transactions may continue to be charged to your account until you change the billing. Also, if we believe you have authorized a transaction or are attempting to use your account after you have requested to close the account, we may allow the transaction to be charged to your account.

## REFUSAL TO HONOR YOUR ACCOUNT

We are not liable for any refusal to honor your account. This can include a refusal to honor your card or account number or any check written on your account. We are not liable for any retention of your card by us, any other financial institution, or any provider of goods or services.

## HOW YOU MAY STOP PAYMENT ON AN ACCESS CHECK

You may request a stop payment on an access check by providing us with the access check number, dollar amount, and payee exactly as they appear on the access check. Oral and

written stop payment requests on an access check are effective for six months from the day that we place the stop payment.

## YOU MAY NOT POSTDATE AN ACCESS CHECK

You may not issue a postdated access check on your account. If you do postdate an access check, we may elect to honor it upon presentment or return it unpaid to the person that presented it to us for payment, without in either case waiting for the date shown on the access check. We are not liable to you for any loss or expense incurred by you arising out of the action we elect to take.

## TRANSACTIONS MADE IN FOREIGN CURRENCIES

If you make a transaction in a foreign currency, the transaction will be converted by Visa International or MasterCard International, depending on which card you use, into a U.S. dollar amount in accordance with the operating regulations or conversion procedures in effect at the time that the transaction is processed. Currently, those regulations and procedures provide that the currency conversion rate to be used is either (1) a wholesale market rate or (2) a government-mandated rate in effect one day prior to the processing date, increased by one percent in each case. Visa or MasterCard retains this one percent as compensation for performing the currency conversion service. The currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or the posting date.

## BENEFITS

We may offer you certain benefits and services with your account. Any benefits or services are not a part of this Agreement, but are subject to the terms and restrictions outlined in the benefits brochure and other official documents provided to you from time to time by or on behalf of MBNA America. While any benefits or services described in the previous sentence are not a part of this Agreement, any claim or dispute related to any such benefit or

service shall be subject to the Arbitration and Litigation section of this Agreement. We may adjust, add, or delete benefits and services at any time and without notice to you.

## WE MAY SELL YOUR ACCOUNT

We may at any time, and without notice to you, sell, assign or transfer your account, any sums due on your account, this Agreement, or our rights or obligations under your account or this Agreement to any person or entity. The person or entity to whom we make any such sale, assignment or transfer shall be entitled to all of our rights and/or obligations under this Agreement, to the extent sold, assigned or transferred.

## YOU MUST NOTIFY US WHEN YOU CHANGE YOUR ADDRESS

We strive to keep accurate records for your benefit and ours. The post office and others may notify us of a change to your address. When you change your address, you must notify us promptly of your new address.

## WHAT LAW APPLIES

This Agreement is made in Delaware and we extend credit to you from Delaware. This Agreement is governed by the laws of the State of Delaware (without regard to its conflict of laws principles) and by any applicable federal laws.

## THE PROVISIONS OF THIS AGREEMENT ARE SEVERABLE

If any provision of this Agreement is found to be invalid, the remaining provisions will continue to be effective.

## OUR RIGHTS CONTINUE

Our failure or delay in exercising any of our rights under this Agreement does not mean that we are unable to exercise those rights later.

## UNAUTHORIZED USE OF YOUR CARD

Please notify us immediately of the loss, theft, or possible unauthorized use of your account at 1-800-421-2110.

22

**ARBITRATION AND LITIGATION**

This Arbitration and Litigation provision applies to you unless you were given the opportunity to reject the Arbitration and Litigation provisions and you did so reject them in the manner and timeframe required. If you did reject effectively such a provision, you agreed that any litigation brought by you against us regarding this account or this Agreement shall be brought in a court located in the State of Delaware.

Any claim or dispute ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or any prior Agreement or your account (whether under a statute, in contract, tort, or otherwise and whether for money damages, penalties or declaratory or equitable relief), including Claims regarding the applicability of this Arbitration and Litigation Section or the validity of the entire Agreement or any prior Agreement, shall be resolved by binding arbitration.

The arbitration shall be conducted by the National Arbitration Forum ("NAF"), under the Code of Procedure in effect at the time the Claim is filed. Rules and forms of the National Arbitration Forum may be obtained and Claims may be filed at any National Arbitration Forum office, www.arb-forum.com, or P.O. Box 50191, Minneapolis, Minnesota 55405, telephone 1-800-474-2371. If the NAF is unable or unwilling to act as arbitrator, we may substitute another nationally recognized, independent arbitration organization that uses a similar code of procedure. At your written request, we will advance any arbitration filing fee, administrative and hearing fees which you are required to pay to pursue a Claim in arbitration. The arbitrator will decide who will be ultimately responsible for paying those fees. In no event will you be required to reimburse us for any arbitration filing, administrative or hearing fees in an amount greater than what your court costs would have been if the Claim had been resolved in a state court with jurisdiction. Any arbitration hearing at which you appear will take place within the federal judicial district that includes your billing

23

address at the time the Claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"). Judgment upon any arbitration award may be entered in any court having jurisdiction. The arbitrator shall follow existing substantive law to the extent consistent with the FAA and applicable statutes of limitations and shall honor any claims or privilege recognized by law. If any party requests, the arbitrator shall write an opinion containing the reasons for the award.

No Claim submitted to arbitration is heard by a jury and no Claim may be brought as a class action or as a private attorney general. You do not have the right to act as a class representative or participate as a member of a class of claimants with respect to any Claim. This Arbitration and Litigation Section applies to all Claims now in existence or that may arise in the future.

This Arbitration and Litigation Section shall survive the termination of your account with us as well as any voluntary payment of the debt in full by you, any bankruptcy by you or sale of the debt by us.

For the purposes of this Arbitration and Litigation Section, "we" and "us" means MBNA America Bank, N.A., its parent, subsidiaries, affiliates, licensees, predecessors, successors, assigns, and any purchaser of your account, and all of their officers, directors, employees, agents and assigns or any and all of them. Additionally, "we" or "us" shall mean any third party providing benefits, services, or products in connection with the account (including but not limited to credit bureaus, merchants that accept any credit device issued under the account, rewards or enrollment services, credit insurance companies, debt collectors and all of their officers, directors, employees and agents) if, and only if, such a third party is named by you as a co-defendant in any Claim you assert against us.

24

If any part of this Arbitration and Litigation Section is found to be invalid or unenforceable under any law or statute consistent with the FAA, the remainder of this Arbitration and Litigation Section shall be enforceable without regard to such invalidity or unenforceability.

THE RESULT OF THIS ARBITRATION AGREEMENT IS THAT, EXCEPT AS PROVIDED ABOVE, CLAIMS CANNOT BE LITIGATED IN COURT, INCLUDING SOME CLAIMS THAT COULD HAVE BEEN TRIED BEFORE A JURY, AS CLASS ACTIONS OR AS PRIVATE ATTORNEY GENERAL ACTIONS.

## YOUR BILLING RIGHTS

**Keep This Notice for Future Use:** This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us in Case of Errors or Questions About Your Bill:** If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet (or use a copy of the form provided on your bill) at MBNA America Bank, N.A., P.O. Box 15026, Wilmington, DE 19850. Write to us as soon as possible. Do not send the notice on or with your payment. We must hear from you no later than 60 days after we sent you the first bill on which the transaction or error appeared. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information: (1) your name and account number; (2) the dollar amount of the suspected error; (3) the posting date of the transaction in question; and (4) a description of the error and an explanation, if you can, of why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your credit card bill automatically from your savings or checking account with us, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us three business days before the automatic payment is scheduled to occur.

**Your Rights and Our Responsibilities After We Receive Your Written Notice:** We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we did not make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within twenty-five (25) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill, and we must tell you the name of anyone we report you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we do not follow these rules, we cannot collect the first $50 of the questioned amount, even if your bill was correct.

**Special Rule for Credit Card Purchases:** If you have a problem with the quality of the property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the

26

property or services. There are two limitations on this right:

(1) You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address and;

(2) The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

MBNA and MBNA America are federally registered trademarks of MBNA America Bank, N.A.

©2002 MBNA America Bank, N.A. All rights reserved.

27

0741300020172C1D4M21503039721

# Exhibit B

1          UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2                 WESTERN SECTION

3

4

5    ROBERT DIAMOND        .    Docket No. CA 03-30185-MAP
                           .
6          v.              .    Springfield, MA
                           .
7    MBNA                  .    October 17, 2003
     .......................    3:01 p.m.
8

9

10

11             TRANSCRIPT OF HEARING HELD

12      BEFORE THE HONORABLE MICHAEL A. PONSOR,

13       UNITED STATES DISTRICT COURT JUDGE.

14

15

16   APPEARANCES:

17

     For the plaintiff:  Mark Bluver and Taruna Garg, 1441
18                        Main Street, Suite 1100, Springfield,
                          MA 01075.
19

20

21   For the defendant:  Beth Bookwalter, 60 State Street,
                          Boston, MA 02109.
22

23             Alice Moran, CSR, RPR, RMR
              Official Federal Court Reporter
24              1550 Main Street, Room 536
                   Springfield, MA 01103
25       Tel: 413-731-0086  Fax: 413-737-7333

```
 1                    (Hearing commenced at 3:01.)

 2

 3              THE CLERK:  This is the case of Robert Diamond

 4      versus MBNA, Civil Action, 03-30185.

 5              THE COURT:  We are here this afternoon for

 6      argument on the defendant's motion to dismiss and compel

 7      arbitration, or in the alternative to stay these court

 8      proceedings pending completion of arbitration.

 9          What I'd like to do is in a brief and crude way

10      summarize what I understand to be the background facts

11      and also the little flashpoints of disagreement between

12      the parties and then hear your argument.

13          Before I get started, I think I'd like to have

14      counsel introduce themselves so I know who I've got here.

15      I will start here on my left.

16              MS. GARG:  Good afternoon, Judge.  Taruna Garg

17      of Shatz, Schwartz & Fentin.

18              THE COURT:  Very good.  Mr. Bluver.

19              MR. BLUVER:  Good afternoon, Your Honor.  Mark

20      Bluver.

21              THE COURT:  Very Good.

22              MS. BOOKWALTER:  Good afternoon, Your Honor.

23      Beth Bookwalter from Hale & Dorr representing MBNA.

24              THE COURT:  Okay.  One thing I should put on

25      the record is that Mr. Bluver and I know each other in a
```

1   non-judicial capacity.  We both enjoy bike riding and

2   several times we have been in the same group of riders

3   taking weekend rides.  It's been a while since we've done

4   that, but we do have occasional contacts doing that and

5   also occasionally meeting over at the gym.

6       We don't have an association that's close enough

7   that I feel my objectivity is in any way compromised or

8   even touched, but that is a fact and I just want to make

9   sure defense knew about it.  If you begin to sense

10  there's a problem, bring it to my attention.  You can

11  file an appropriate motion but I wanted to let you know

12  that.

13              MS. BOOKWALTER:  Thank you, Your Honor.

14              THE COURT:  This is in some ways a simple case.

15  It involves the plaintiff who has had a series of

16  problems with charges on his MBNA credit card arising

17  from, as I understand it, online gambling.

18      He has been a credit card holder since 1987 I

19  believe, and -- yes, a credit card holder since November

20  of 1987 with MBNA.

21      In 1999, after Mr. Diamond had been holding the

22  credit card for more than ten years, MBNA amended its

23  agreement with its card holders to include a mandatory

24  arbitration clause which I'll refer to as the amendment.

25      One point of disagreement which I'll look forward to

1    hearing from you about during oral argument is the

2    question of how relevant it is that the plaintiff denies

3    receiving a copy of that amendment, being put on notice

4    of that amendment.

5        The defendant takes the position that there is a

6    presumption when notification occurs in the ordinary

7    course of business that the notification was received.

8        The defendant points out that the plaintiff indeed

9    received his bills on a regular basis at his ordinary

10   place of residence and paid those bills, and that there

11   is a presumption that the amendment was sent out to the

12   same location and that he received it.

13       Mr. Diamond has submitted an affidavit saying that

14   he did not to the best of his knowledge receive the

15   amendment.  And so I'm in somewhat of a quandary, a mild

16   quandary, about that issue.  Because on the one hand it

17   is conceivable that an entity like MBNA, which I assume

18   has tens of thousands, if not hundreds of thousands of

19   card holders, conceivably could forget to send or for

20   some reason omit to send a copy of the agreement to the

21   card holder.

22       It would be hard for them to say absolutely when a

23   card holder says he doesn't think that they ever got a

24   copy of the amendment to point to a registered letter or

25   anything of that sort which would positively confirm that

1    the copy of the amendment was sent.

2         On the other hand, I'm also aware of the fact that

3    most of us when we get this junk from our credit card

4    companies look at it.  We're mystified.  We confirm that

5    it's not a bill and we chuck it in the garbage and forget

6    about whether we ever got it or not.  So I don't know

7    really what that situation is or how relevant that is to

8    the issues in this case.

9         But in any event the defendant says we did it.  It

10    was part of our ordinary practice.  We never had any

11    problem staying in touch with Mr. Diamond.  He must have

12    gotten it.  Mr. Diamond says as far as I know, I never

13    did get it and I don't know the significance of that or

14    how that point should be handled.

15         But, in any event, I think it is undisputed that at

16    least from MBNA's point of view that they did amend their

17    agreement with the card holders and include a mandatory

18    arbitration clause.

19         Two years later, or a year plus later, Mr. Diamond

20    got into some problems with his credit card related to

21    gambling online.

22         Now why anybody would ever do that, heaven only

23    knows.  But, in any event, he did it and he got into

24    problems where he owed over $30,000 on his credit card as

25    a result of online gambling.

1      Now, Mr. Diamond took the position that at least

2    some of that $30,000 plus debt was not legitimate.  That

3    he had winnings which weren't credited.  That there were

4    charges that shouldn't have been on there.  It seems

5    undisputed that at least a significant portion however of

6    that $30,000 plus was -- he took his chance and he lost.

7      Okay.  He contacted MBNA and there was some

8    negotiations which went on and at the conclusion of which

9    it emerged that the credit card company was willing to

10   take $2,500 in complete satisfaction of the $30,000 plus

11   debt that Mr. Diamond was looking at.

12      Around this time, or during the course of these

13   discussions as I understand it, Mr. Diamond was told by

14   somebody at MBNA that we don't enforce gambling debts.

15   Why they wouldn't, I don't know.  But, in any event,

16   somebody said something about we don't enforce gambling

17   charges on our credit cards.

18      I guess what happened at that point was that Mr.

19   Diamond then decided that he probably was being wreckless

20   in suggesting that he even paid $2500 when he really

21   could perhaps not pay anything so he wrote a letter

22   purporting to withdraw his offer apparently to pay the

23   $2500.

24      Then things get a little bit more mystifying because

25   only about three months later Mr. Diamond racks up

1    another $30,000, or at least his credit card reflects a

2    claim of $30,000, an additional $30,000 plus charges

3    related to online gambling and he again disputed the

4    charge.

5         Again, there seems to be -- again, I'm kind of

6    drawing inferences here, but there seems to be a claim on

7    the one hand that the charges were inflated unfairly.

8    That it contains at least some charges that he shouldn't

9    have to pay, and also that maybe he did lose some portion

10   of this $30,000.

11        So there's two defenses to the $30,000 as I

12   understand it.  One is I shouldn't have to pay any of it

13   because I shouldn't have to pay gambling losses that I

14   incurred online.

15        That strikes me as kind of strange because it gives

16   somebody, I suppose -- I don't think he'd give the money

17   back if he won.  So you go online and you use your credit

18   card and bet and then if you lose, you don't have to pay

19   it.  So there's an aspect of this whole gambling online

20   thing that kind of goes over my head.

21        But he makes a claim that he doesn't have to pay any

22   of that because it's a gambling debt I think, but he

23   makes a claim that even if I have to pay what we might

24   call legitimate gambling debts -- that is money that I

25   actually bet and lost -- there's some portion of this

1  $30,000 which is over and above that and which is not

2  legitimate even if you assume that some of the gambling

3  charges are partly his responsibility.  So he has, for

4  lack of a better word, a beef about this second $30,000

5  debt that he racked up online.

6  At this point, apparently if I understand it

7  correctly, MBNA is saying, well, no.  You owe the $30,000

8  and you also owe the $2500 that we agreed you would pay

9  the first time you got into this problem, and I think

10  that in crude terms is what their position is right now.

11  You owe us $30,000 plus and the plaintiff's position is

12  no, I don't.  It's disputed.

13  When the dispute occurred, MBNA invoked its

14  arbitration clause in its current agreement with its card

15  holders, and apparently the claim by MBNA now is for a

16  little over $30,000, $30,300 and change.

17  MBNA invoked the arbitration clause before the

18  National Arbitration Forum.  The plaintiff filed a

19  response to the arbitration claim.  There was a so-called

20  document hearing which was scheduled in June.  Plaintiff

21  filed an objection to that, and then in June of this year

22  filed this lawsuit in superior court several counts

23  including some federal statutes.  It was removed here by

24  MBNA and here we are.

25  MBNA's argument is pretty simple.  The agreement

1    calls for arbitration; you're not supposed to be here.

2    You're supposed to be in arbitration.

3        Everybody concedes that federal courts love

4    arbitration.  Supreme Courts love arbitration.  Federal

5    courts love arbitration.  That's one headache we don't

6    have to deal with.   It goes into arbitration and there

7    it is.  So there is quite a strong presumption in favor

8    of arbitration which is a boulder that the plaintiff is

9    going to have to deal with here that is not an easy

10   boulder to overcome.

11       The plaintiff takes the position that the

12   arbitration agreement is not enforceable.  First of all,

13   it was a contract of adhesion.  The defendant says that

14   doesn't matter.  It was a take-it-or-leave-it kind of

15   contract.

16       The defendant's position is he was given an

17   opportunity to opt out.  He could have decided that he

18   was going to get his credit card from some other company

19   if he wanted to, and there is nothing that in any way

20   undermines an arbitration agreement simply because it's a

21   one-way contract.

22       The defendant also takes the position that

23   consideration for that agreement was the defendant's

24   continued supplying of credit.

25       The plaintiff takes the position that the

1    arbitration agreement was never properly disclosed to the

2    plaintiff and there was never any meeting of the minds

3    about it.  And, again, I'll be interested in hearing the

4    defendant's position on that.

5        The plaintiff also takes the position that there was

6    a unilateral amendment to the terms of the contract.  And

7    it's certainly true that in some cases the court will not

8    recognize unilateral amendments of the terms of a

9    contract but the defendant responds that in the credit

10   card context, this kind of unilateral amendment is

11   recognized and permitted.

12       I myself have written on a couple of occasions in

13   other context that a unilateral agreement or unilateral

14   amendments to an agreement would not be enforceable.  The

15   question is does that case law really apply to this type

16   of a situation?

17       I guess one of the things that I'm concerned about,

18   and this is a question for the plaintiff, is the kind of

19   slippery slope argument.

20       If there's an arbitration agreement in a contract, a

21   credit card contract, does the plaintiff just have to

22   come in and say I never got it?  It's unilateral.  It's a

23   contract of adhesion and I don't have to go to

24   arbitration.  Because if that's the case, you might as

25   well chuck all the arbitration agreements out.  Everybody

1    is going to be able to say with credibility I don't

2    remember ever getting this agreement and in that case

3    there won't be any arbitrations.

4        People will always be able to come in here and get

5    before a jury.  Although, well, in this case I'm not sure

6    how sympathetic a jury would be to an individual who got

7    himself in over his head in this particular way, but that

8    would be a question for later on.

9        So we're arguing really about the nature of the

10   contract and whether the arbitration agreement applies.

11   The defendant's responses to the plaintiffs are pretty

12   simple.  That this is an enforceable arbitration

13   agreement.  It's governed by Delaware law, not

14   Massachusetts law, and the plaintiff should go ahead and

15   get whatever remedies he's going to get in the

16   arbitration proceeding which is already started.

17       That's a very clumsy summary of some fairly nuanced

18   issues but at least it will put the thing in context, and

19   what I think I'd like to hear now is from you, Ms.

20   Bookwalter.  Correct anything that I've misstated; fill

21   in anything significant that I've left out, and we will

22   just get right to the crux of it.

23           MS. BOOKWALTER:  Thank you, Your Honor.  I

24   think your summary of the allegations in the complaint is

25   fair.  Obviously many of them are contested by MBNA, and

1   cases, just rather than go through it case by case, we

2   have tried to at least address some of the issues that

3   were specifically raised by MBNA in its reply brief.

4        THE COURT: Okay. Well, thank you. I have

5   such a strong feeling about the defendant's motion to

6   dismiss that I know that my decision is going to be a

7   painful one for the plaintiff but I might as well just

8   tear the bandage off here and get the pain over with in

9   one swoop because I do feel quite convinced that the

10  defendant's position is the correct one with regard to

11  the arbitration, and I'm going to rule orally on the

12  motion to dismiss and let you see whether my brothers and

13  sisters upstairs in the First Circuit east of here in the

14  First Circuit agree with me.

15       This was a noble effort on behalf of the plaintiff.

16  He's got himself into a bit of a mess here and

17  plaintiff's counsel are doing absolutely the best they

18  can to extricate him from the problem that he's in.  But

19  my very strong feeling, I'm sorry to say from the

20  plaintiff's point of view, is that to the extent that

21  he's going to be extricated from the problem, it's going

22  to have to take place in the context of arbitration.

23       I want to just lay out very briefly what my reasons

24  are for concluding that.  First of all, I am convinced

25  that Delaware law applies here.  I understand that there

1    is a difference in the bargaining power of the two

2    entities, but if I was to accept that as the main

3    argument, it would simply give anyone who was an

4    individual the right to opt out of any contractual choice

5    of law provision on the ground that that person was in a

6    weaker position at the time that the contract was entered

7    into.  I don't believe that's the law.  I don't believe

8    it's fair.

9         The defendant made it very clear if you want to use

10   our credit services, you're going to have to recognize

11   that Delaware law applies.  If you don't like it, you can

12   go down the street and get a card from someone else that

13   may use a different law.

14        Even if I was to step back and use the choice of law

15   provisions, this is a particularly tough situation for

16   the plaintiff to argue that some law other than Delaware

17   applies.  MBNA is a Delaware corporation.  It informed

18   the plaintiff that they were going to be using Delaware

19   law at the time the contract was entered into.

20        Mr. Diamond lives in Massachusetts.  He has that in

21   his favor, like probably tens of thousands of other

22   people, hundreds of thousands of MBNA's customers.

23        He's not a citizen of Delaware.  Massachusetts' law

24   is more perhaps, although the defendant disagrees, but

25   perhaps for purposes of argument we can say it's somewhat

1    more favorable to the plaintiff.  But again that sort of

2    begs the question, the whole idea -- the whole problem is

3    what law applies, and any time a plaintiff has a better

4    law in his hometown, he's going to be asserting that law.

5        The actual credit was extended somewhere out there

6    in god knows where in cyber space.  The gentleman is

7    sitting on his computer participating in the gambling.

8    It's not like he bought a car down the street here in

9    Massachusetts and that the transaction might be governed

10   by the law of Massachusetts.

11       So wherever this transaction occurred where he found

12   himself the target of these credit charges, it was

13   perhaps defined as just about anywhere out in cyber

14   space.

15       So I think even applying the traditional rules that

16   are used to determine the choice of law, the best

17   argument is that Delaware law really applies.  If

18   Delaware law applies, the plaintiff is clearly out here.

19       In addition, I believe that the original agreement

20   was valid.  All of its terms were valid.  They were

21   without any dispute disclosed to the plaintiff.  The

22   agreement in its original form gave the defendant the

23   right to unilaterally modify the agreement.  The

24   defendant took advantage of that right that it had in

25   1999.

1    I was concerned about this issue of notice.

2  However, I am persuaded that regular procedures were

3  followed, contact with Mr. Diamond was maintained

4  continuously.  There isn't any argument that he changed

5  his address or changed his residence or ever had any

6  problem staying in touch with MBNA, and I think under the

7  circumstances the presumption of proper notice is

8  sufficient to create a record justifying summary

9  judgment.

10    The consideration was the continuation of the

11  extension of credit, and I believe that a unilateral

12  amendment to an at-will contract in these circumstances

13  is valid.

14    Mr. Diamond, assuming that he received notice and I

15  am presuming that for purposes of summary judgment, had

16  the opportunity to opt out and obtain his credit services

17  from some other entity if he wanted to.

18    Under these circumstances my conclusion is that the

19  arbitration agreement contained in the 1999 amendment is

20  valid, does cover this situation, and I'm not going to be

21  doing anybody any favors by pretending that I'm going to

22  go back here and change my mind by thinking about it for

23  another three or four months and give you something in

24  writing and leaving this case in limbo.

25    I'm not going to change my mind for better or worse.

1    I'm quite convinced that that is the proper way to

2    approach this case.  I'm not particularly happy to do

3    that.

4        Mr. Diamond is in a somewhat sympathetic position as

5    kind of a David in conflict with a Goliath.  One's heart

6    is always with the Davids of this world rather than the

7    Goliaths.  But the fact of the matter is I think he's out

8    of luck here and it's not going to help anybody for me to

9    pretend otherwise.

10       So for the reasons that I've just summarized, I'm

11   going to allow the defendant's motion to dismiss and I'm

12   going to order that the parties proceed to arbitration.

13   I will put this order in writing within the next -- well,

14   actually I'll put this in writing.  I'm going to be away

15   next week so the actual written memoraliziation of my

16   ruling will not come out probably for another ten days or

17   two weeks.  It will only be a page or two and at that

18   point judgment will enter for the defendant and the clock

19   will begin to run on the appeal.

20       It won't begin to run as the words are coming out of

21   my mouth at this moment here at four p.m. on October

22   17th.  It will be in the form of a written ruling with

23   formal judgment which you will probably be receiving

24   sometime towards the end of this month.

25       I'm just sorry to say that if somebody is going to

 1    find that this arbitration agreement isn't enforceable,

 2    it's going to have to be the Court of Appeals, not Judge

 3    Ponsor.   I just feel that it is enforceable under these

 4    circumstances.   I do thank both of you very much for your

 5    very thorough briefing and your very helpful arguments

 6    but I'm afraid that's where I come out.   All right.

 7    Thank you very much.   The court is in recess.

 8

 9                    (Court recessed at 4:00.)

10

11

12    UNITED STATES OF AMERICA
      DISTRICT OF MASSACHUSETTS
13    CITY OF SPRINGFIELD

14

15           I, Alice Moran, do hereby certify that the

16    foregoing is a true and accurate transcription of my

17    stenographic notes to the best of my knowledge and

18    ability.

19           Certified on December 1, 2003.   My commission

20    expires on April 8, 2005.

21

22

23                    _____
                      Alice Moran, CSR, RPR, RMR
24                    Official Federal Court Reporter

25